[Cite as *State v. Moore*, 2024-Ohio-994.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No. L-23-1084

    Appellee                                       Trial Court No.  CR0202101222

v.

Kevin Moore                                            **DECISION AND JUDGMENT**

    Appellant                                      Decided:  March 15, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Brad F. Hubbell, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a bench trial, defendant-appellant, Kevin Moore, appeals the

March 20, 2023 judgment of the Lucas County Court of Common Pleas, convicting him

of aggravated murder, attempt to commit aggravated murder, and felonious assault, and

rejecting his affirmative defense of not guilty by reason of insanity.  For the following

reasons, we affirm the trial court judgment.

# I. Background

{¶ 2} It is not disputed that on February 5, 2021, Kevin Moore shot five-year-old Ah.P., four-year-old As.P., and 14-month-old G.P. Ah.P. and G.P. died of gunshot wounds to the head and chest; As.P. survived a gunshot wound to his face. Moore was indicted on two counts of aggravated murder, violations of R.C. 2903.01(C) and (G) (Counts 1 and 2), one count of attempt to commit aggravated murder, a violation of R.C. 2923.02 and 2903.01(C) and (G) (Count 3), and two counts of felonious assault, violations of R.C. 2903.11(A)(2) and (D) (Count 4 and 5), all with firearm specifications under R.C. 2941.145(A), (B), (C), and (F). Counts 1 through 4 were tried to the bench, and Count 5 was dismissed before trial.

## A. Moore shot his girlfriend's children.

{¶ 3} According to the evidence presented at trial, Moore was the boyfriend of C.P., the victims' mother. The victims and their two-and-a-half-year-old sister lived in an apartment on Byrneport Drive with their mother and Moore. C.P. left the apartment in the late morning or early afternoon to help a family member move. Moore remained at the apartment with the children. C.P. returned about an hour-and-a-half later. Moore kissed her and told her he loved her.

{¶ 4} C.P. asked Moore to go to the parking lot and get a car seat out of her sister's van. Her daughter came into the kitchen and told her that Moore had made the baby's nose bleed. C.P. went to check on the boys and found that they had all been shot. She called 9-1-1 and ushered her daughter into a neighbor's apartment.

2.

{¶ 5} Another 9-1-1 caller reported that Moore was outside in the parking lot firing additional rounds. Police and emergency crews responded to the scene. The first officers to arrive found Moore sitting in a van pointing a gun at them. With their own weapons drawn, the officers commanded Moore to drop the gun. After some tense moments, Moore complied and was apprehended.

{¶ 6} Other officers arrived and first responders entered the apartment to find Ah.P. and G.P. deceased. They had both been shot in the head and chest. As.P. had been shot in the face, but was still alive. Emergency crews immediately realized that G.P. could not be saved. Efforts were made to resuscitate Ah.P., but he could not be revived. All three boys were transported to Toledo Hospital by ambulance. As.P. was transferred to the University of Michigan Hospital and has recovered from his injuries, but suffers migraine headaches.

## B. Detectives interviewed Moore.

{¶ 7} Detective Danielle Mooney and Detective Cowell questioned Moore that evening. The recording of that interview was played at trial. Before answering questions about the shootings, Moore wanted to provide detailed background information about his past. He told the detectives that he had been separated from his own daughters and was concerned for their safety. He claimed that his children had been kidnapped by their mothers. Moore also said that he had been abused by his aunt, but he explained that he "cling[s]" to women.

3.

{¶ 8} Moore told the detectives that he was originally from Georgia, but moved to Florida, then Indianapolis, before coming to Toledo in August of 2020. He described some of his prior criminal convictions and incarcerations in Florida, and suggested that he had been falsely accused of some of those crimes, which included armed robberies, child abuse, and resisting arrest.

{¶ 9} When asked what brought him to Toledo, Moore told the detectives that he "started to do a lot of wrong for right" and was "still taking disciplinary actions to teach people lessons." He acknowledged shooting the boys, but maintained that he shot them as discipline for picking on their sister. He told the detectives, "these kids were abusing this little girl."

{¶ 10} Moore said that the children's father abused C.P. and the children, especially Ah.P. He believed that the boys were picking up these patterns "judging by what they put their sister through." He said they picked on her and did "all this dumbass shit." Moore told the detectives he "couldn't take that shit no more." They asked what happened. Moore responded, "what you saw."

{¶ 11} The detectives told Moore that they didn't see anything because they went to the apartment much later. They asked Moore for more specific information. Moore put his head in his hands as he answered questions about the shootings. He said the boys were picking on their sister and he heard the little girl crying upstairs. He went upstairs to check on her and "[i]t immediately stopped as [he] entered." In response to repeated

4.

questions about what happened, Moore said "what you saw" and "the work speaks for itself."

{¶ 12} Moore told the detectives "I'm not coming back from this shit." He claimed that what he did was a "debt of honor." He explained that he felt he had to protect the little girl from her brothers. They asked how he had protected her. He tapped on the table and said "one, two, one, two, one"—indicating how many shots he fired at each boy. The detectives asked Moore specifically how many times he shot each boy. Moore indicated with his fingers that, using the gun he carried in his waistband, he shot Ah.P. twice, As.P. once, and G.P. twice. Moore's head remained in his hands as he explained what happened.

{¶ 13} Moore said that he took the little girl downstairs, then he went back up. He hesitated to provide additional details, but the detectives told him that they had to hear the information from him because they couldn't get it from the boys. Moore told them that they could hear the information from the boys if they understand science, but he agreed that the boys could not use their words to tell what happened. He acknowledged that he shot G.P. in the hallway at the top of the stairs, Ah.P. on the bedroom floor, and As.P. in the bedroom on the bed against the wall. He then pulled G.P. into the bedroom to be with his brothers. Afterwards he went downstairs and put the little girl's favorite cartoons on until C.P. came home. When C.P. got home, he turned on one of his favorite songs.

{¶ 14} Moore went out to the parking lot and sat in a gold minivan with C.P.'s sister. While he was outside, C.P. found the boys in their room. C.P.'s sister got out of

5.

the car and ran inside when she learned the boys had been shot. Moore discharged the remaining bullets into the air so the police would come faster and the gun would be empty. He again described his act as a "debt of honor." He said he had protected the little girl "at all costs."

{¶ 15} Moore confirmed that it was his intention to kill the boys for what they had done to their sister. He told the detectives that he believes in reincarnation. When pressed by detectives whether he intended for the boys to die, he said he does not have "a philosophy on death," however, he acknowledged that he had ended the boys' lives as most people believe and understand it. Moore was adamant that he had no plan to harm any of the other individuals that were there (which, apparently, included C.P., her sister, her sister's boyfriend, and possibly others—the record is unclear); he intended to harm only the boys for what they had done to their sister. The others had done nothing wrong.

{¶ 16} The detectives asked Moore questions about his compliance with the police officers. Moore told them that he had seen on television a man coming out of a burning church firing at officers and this scenario was in his mind when the police came. He did not want that situation for himself. Moore admitted, however, that he had pointed his gun at the officers and he described how the officers approached him with their weapons drawn "despite what [he] could've done to them." He said it "confused the shit out of [him]" that the officers didn't fire at him, and he "took that into consideration" when he decided to surrender rather than shoot at the officers. He said he "had so much time" and

6.

"could've just reamed them" with the additional 17 rounds that he had available. Ultimately, he threw one gun out the door and put the other one in the snow.

{¶ 17} The detectives asked Moore for consent to obtain a buccal swab for DNA comparison purposes. Moore questioned why detectives would need DNA, but he consented to providing the sample.

### C. Moore argued that he was not guilty by reason of insanity.

{¶ 18} Moore did not deny that he committed the offenses with which he was charged, but he claimed that he was not guilty by reason of insanity (NGRI). Three expert witnesses provided opinions pertinent to his defense. Gregory Forgac, Ph.D., Thomas Sherman, M.D. and Mark Babula, Ph.D. all submitted reports under R.C. 2945.371(H)(4) and testified at trial, and all three agreed that Moore was mentally ill. Drs. Forgac and Sherman concluded that Moore was not legally insane at the time he committed the offenses. Dr. Babula opined otherwise.

### 1. Dr. Forgac

{¶ 19} Dr. Forgac testified that the first time he tried to evaluate Moore relative to his NGRI defense, Moore was not cooperative. The second time, he was able to complete the evaluation. Moore was medicated at that time. Dr. Forgac observed nothing to suggest that Moore was acutely psychotic on the day of his evaluation.

{¶ 20} As part of his evaluation, Dr. Forgac reviewed various records, including hospital records from Georgia Regional Hospital in Savannah and Gracepoint Hospital in Tampa; Moore's criminal history; and police reports containing Moore's statement to

7.

detectives. Dr. Forgac performed a mental status examination; obtained information from Moore concerning his drug and alcohol use, health history, social history, criminal history, education, employment, and relationship history; took Moore's statement about the incident; and rendered conclusions concerning Moore's claim of insanity. Dr. Forgac did not view the recording of Moore's interview or recordings of Moore from the back of the police wagon.

{¶ 21} Moore was born in Savannah, Georgia, and lived there until he was nine. He then moved to Florida where he remained until he was 15. He has siblings, but was not in close contact with them. He had previous convictions for domestic violence, auto theft, armed robbery, and aggravated battery, and had spent time in prison for several of those offenses. Moore told Dr. Forgac that he had a daughter who had been taken away from him three years earlier.

{¶ 22} According to the records Dr. Forgac reviewed, Moore was first diagnosed with schizophrenia in 2009. He was hospitalized in 2010, 2014, and 2019 at Georgia Regional Hospital and Gracepoint Hospital. Moore was also hospitalized in Indianapolis and Chattahoochee, Florida, but Dr. Forgac never received records from those hospitalizations. Medical records from Georgia Regional and Gracepoint included diagnoses of psychotic disorder; antisocial personality disorder; schizophrenia, paranoid type; schizophrenia, undifferentiated; and schizoaffective disorder, unspecified. Dr. Forgac explained that schizophrenia cannot be cured, but it can be treated with medication and people can adjust to their symptoms. He said that there is a very

8.

noticeable difference between a person with schizophrenia when they are medicated versus not medicated.

{¶ 23} At the time of the incident, Moore said that he was self-medicating with Xanax so he wouldn't have to see a psychologist. He had run out of medication before the shooting occurred. He denied using crack or injectable drugs. Moore denied feeling that he was mentally ill, but told Dr. Forgac he "may be in denial." He reported that when he is alone, he has heard voices. He said that he has twitches and ticks, but Dr. Forgac did not observe any twitches or ticks during his evaluation. Moore talked about seeing shadows, feeling things crawling on him when there's nothing there, smelling bad smells, feeling that he is a different person, and feeling like the television is talking to him and sending him secret messages.

{¶ 24} Regarding the shootings, Moore told Dr. Forgac that he never wanted it to happen and the boys were abusing their sister. Moore recalled that he was off work that day, but said that he did not remember anything else until being handcuffed to the bench. He talked about having a conversation with a lady and a guy, which Dr. Forgac presumed to be Detectives Mooney and Cowell.

{¶ 25} Because Moore said he couldn't remember the events, Dr. Forgac had to fill in the blanks with the report of Moore's interview. At the interview, Moore recounted shooting the gun 12 times and told the detectives that he shot the children one at a time to discipline them for picking on their sister. Moore described the shootings indirectly by saying things like "one, two, one, two." Based on Moore's statements about

9.

his daughters and being raised by women, Dr. Forgac gathered that Moore felt protective of females. He acknowledged it was significant that Moore had been separated from his daughter, but did not believe it was directly related to his claim of NGRI.

{¶ 26} Dr. Forgac explained that a person can be mentally ill and even psychotic, yet still understand the wrongfulness of his actions. More specifically, a person can have schizophrenia and still know right from wrong. Ultimately, based on the records and his interview of Moore, Dr. Forgac concluded that Moore knew the wrongfulness of his acts at the time they occurred and did not meet the criteria of NGRI.

{¶ 27} Several things informed Dr. Forgac's opinion that Moore appreciated the wrongfulness of his actions, including that he tried to hide the gun, he went outside and shot the gun in the air so the police would come more quickly, he went downstairs and watched cartoons with the little girl right after shooting the boys, and he said he "couldn't take this shit anymore," which Dr. Forgac interpreted to mean the behavior of the boys. It was pertinent to Dr. Forgac that people did not expect this event to happen and were shocked by it. He said that it may have been an impulsive act. Dr. Forgac acknowledged that Moore's belief in reincarnation may have played a role in what happened, but he made no mention of it in his report.

## 2. Dr. Sherman

{¶ 28} Dr. Sherman testified that he interviewed Moore twice. Moore was medicated when Dr. Sherman met with him. Like Dr. Forgac, Dr. Sherman reviewed records, including hospital records from Georgia and Florida; performed a mental status

evaluation; obtained information from Moore concerning his drug and alcohol use, mental health and health history, criminal and behavioral history, employment, and relationship history; took Moore's statement about the incident; and rendered conclusions concerning Moore's claim of insanity.

{¶ 29} Moore's criminal history included battery on a law enforcement officer, domestic battery, cruelty towards a child, armed robbery with a firearm, and multiple instances of domestic violence. Dr. Sherman also learned that Moore had once drowned a dog because he wanted to dissect it.

{¶ 30} Moore has one stepdaughter and two daughters with two different women. Moore reported being affected by his separation from his daughters. He also believed that one of his children was being abused. In the incident here, Moore believed the boys were abusing their sister, which is what prompted him to shoot the boys. Dr. Sherman agreed that Moore's history of separation from his daughters may bear a significant relationship to the incident.

{¶ 31} Dr. Sherman learned from hospital records that in 2014, Moore was diagnosed with schizophrenia. Records from the Georgia hospital indicate that he was laughing and talking to himself and reported seeing purple people. Records from Florida show that he was diagnosed with schizophrenia and symptoms of paranoia. He was hospitalized again in 2016, and 2017, and was also diagnosed with schizoaffective disorder, bipolar type. In 2020, he was reported to have been playing with dog feces and

11.

had also attempted to cut his own neck. At that time, he presented with psychosis, disorganized behavior, and agitation.

{¶ 32} It was clear to Dr. Sherman that Moore suffers from some form of schizophrenia that involves peculiar thoughts, sometimes with depressed affect. Schizophrenia has no cure, but it can be managed with medication. Dr. Sherman believes Moore was experiencing a psychotic episode at the time of the incident and would not be surprised that he didn't remember that much about it. He said there was ample evidence of serious mental illness.

{¶ 33} In talking to Dr. Sherman, Moore was vague about the shootings, but Dr. Sherman reviewed police reports of Moore's version of what took place that day. Moore spoke to officers unintelligibly. Dr. Sherman recalled that there was some mention about an argument between Moore and C.P. Moore told Dr. Sherman that he never should have been in possession of a weapon and that he had lashed out. He said, "I fucked up and I got no explanation." Moore also believed the children were being molested. He shot the boys because he believed they were picking on their sister. Dr. Sherman agreed that Moore acted disproportionately and irrationally in shooting the boys for picking on their sister. He also agreed that Moore's comment that he "fucked up" may have been in retrospect based on knowledge gained through discovery, the news media, or his own memory. Overall, Moore's comment about "fucking up" did not play a big role in Dr. Sherman's conclusions.

12.

**{¶ 34}** Dr. Sherman concluded that Moore understood the wrongfulness of his actions. He believes that Moore had a psychotic episode at the time of the incident, characterized by disorganization of thinking or speech that is evident to virtually anyone, but he believes that it was not so severe that it impacted Moore's knowledge of its wrongfulness. On a scale of one to ten, Dr. Sherman estimated the severity of Moore's condition as a 9.5. But he explained that someone can suffer from mental illness and still know right from wrong, and he emphasized that the legal standard for insanity has become strict. Forty years ago, he may have opined that Moore was NGRI, but the standard is much stricter now.

**{¶ 35}** Dr. Sherman explained his reasons for concluding that Moore was not legally insane. First, Moore had a predilection for violence and was previously diagnosed with antisocial behavior, so this conduct was not entirely out of character for Moore. Second, the records indicate that Moore and C.P. argued before the offense and C.P. allegedly told him, "you ain't going to do nothing to my kids," suggesting a motive "other than a crazy one." Third, Moore told detectives that he shot into the air to attract the police more quickly, knowing that they were coming, suggesting that he understood the wrongfulness of his conduct. Fourth, Moore did not flee the scene. Fifth, Dr. Sherman saw no records to suggest that Moore had obvious psychotic symptoms that impaired his knowledge of wrongfulness that day. Finally, there was no indication of previous 9-1-1 calls where C.P. reported that Moore was "going crazy."

13.

{¶ 36} Dr. Sherman acknowledged that Moore had never disciplined a child by shooting them, but he pointed out that Moore did have cases involving violence against children. He also opined that Moore may have a lack of conscience and inability to control his temper.

### 3. Dr. Babula

{¶ 37} Dr. Babula testified that he reviewed records, performed a mental status evaluation of Moore, and went through reported drug and alcohol use, mental health and health history, developmental and social history, education and employment history, criminal and behavioral history, and relationship history. He also conducted two tests to evaluate Moore's mental health functioning—the MMPI-3 and SIRS. The results of those tests were inconclusive. Much of the information Dr. Babula received was self-reported by Moore. He did not watch the recording of Moore's interview—he just read the detective's synopsis in her report. He agreed that it would have been helpful to have watched it.

{¶ 38} Dr. Babula was aware that Moore had a criminal history that included convictions of aggravated robbery, carrying a concealed weapon, rape with a gun specification, domestic violence, battery, resisting arrest, and domestic violence-strangulation. He was not aware of the specifics of any of these cases, but he knew Moore had multiple convictions of crimes of violence, so there was an established pattern of behavioral problems.

14.

{¶ 39} Moore told Dr. Babula about multiple negative events that can affect emotional well-being and mental health. He reported that he had been subjected to some level of abuse, experienced disruptions in his home life, moved between residences, was bullied, and was distanced from his children. Moore's lack of contact and control over the care of his daughter was significant. Moore was concerned for his daughter's well-being and believed she was being harmed or mistreated, was exposed to drugs, lived in poor conditions, and was exposed to potential harm.

{¶ 40} Moore reported instability in employment. The longest he had been employed was eight months. Moore had used heroin, ecstasy, alcohol, and marijuana, but Dr. Babula does not remember substance abuse being a major factor.

{¶ 41} Dr. Babula was aware that Moore had multiple hospitalizations for mental illness. The records indicate that Moore was hospitalized in Georgia, Florida, and Indianapolis, and had been diagnosed with schizophrenia. He explained that schizophrenia is a psychotic disorder that involves problems with thinking and emotional regulation. Common symptoms include hallucinations, disorganized thinking, delusions, and believing things that aren't true. Schizophrenia cannot be cured, but it can be managed with medication. Bipolar disorder is a mood disorder with extremes in depression and mania. It can also include anger, agitation, and psychotic symptoms. Schizoaffective disorder involves mood swings plus psychotic symptoms. Paranoia is a form of delusion and anxiety where thoughts do not reflect reality. Paranoid people perceive danger in non-dangerous situations.

15.

{¶ 42} Dr. Babula recognized a pattern of symptoms consistent with a psychotic disorder such as schizophrenia, beginning around 2014. He believes that Moore had schizophrenia at the time of the offense, impacting his perception of reality and preventing him from understanding the wrongfulness of his actions at the time he committed the shootings. Dr. Babula agreed that some people with schizophrenia may know right from wrong depending on the nature and the type of symptoms they are experiencing.

{¶ 43} Moore told Dr. Babula that he can't remember what happened, but also admitted that he lashed out. His explanation for the shooting was consistent with what he told detectives—that he was trying to protect the girl. Moore expressed surprise that police did not harm him. Dr. Babula described Moore's behavior as somewhat erratic.

{¶ 44} Police reports demonstrate that Moore was exhibiting disorganized speech and behavior. He talked about reincarnation and his concern for his children. He indicated his desire to protect the female child in the home. His statements evidenced a distortion of reality. It was unclear if the female child was actually facing harm, but Moore perceived that she was and he perceived his reaction to be an appropriate response to that perceived harm.

{¶ 45} Moore had an idea about trying to right wrongs and protect daughters. Dr. Babula believes that there's a possibility of a connection between his motive for shooting the boys and his desire to protect his own daughter. He believes that it is possible Moore made these connections and they were highly impacting him. Moreover, Moore seemed

16.

to use "reincarnation" and "science" as a justification for his conduct, as if there was no finality to the harm he caused. Moore believed that killing the boys would change their lives as they knew it, but they would be reincarnated. These statements demonstrate Moore's poor judgment insofar as he believed that reincarnation minimized the harm. His talk of "debt of honor" also demonstrates his disorganized and distorted thinking.

{¶ 46} Dr. Babula agreed that there were some favorable signs of Moore's mental functioning, such as his decision to bury the gun in the snow and follow police commands. This conduct showed goal-oriented behavior and clear thinking. But there was additional information in the records Dr. Babula reviewed indicating that Moore put the gun in the snow, tried to give it someone else, then picked it up and shot it into the air. Dr. Babula described this as erratic behavior that does not reflect the gravity of the situation. He also observed that after the shooting, Moore put on a cartoon and played music. Although Moore knew that police would be coming at some point, his thinking and behavior was disorganized and disconnected from the reality of the situation.

{¶ 47} Dr. Babula was aware that Moore had fired the gun 12 times outside to get police to show up faster. He believed there were multiple possible explanations for this behavior, including that Moore knew what he did was wrong. Dr. Babula was aware that Moore had said he's "not coming back from this," which shows an understanding of the consequences, and that he hid the weapon, complied with police orders, and wanted the police to come more quickly.

17.

{¶ 48} Dr. Babula's ultimate opinion was that Moore did not know the wrongfulness of his actions. But he also observed—both at trial and in his report—that Moore was "not completely incapable of recognizing any wrongfulness of his behavior." He explained that Moore may have recognized that what he did was *illegal*, therefore, the police would be involved and people would perceive it as problematic. But this does not necessarily mean that Moore understood the *wrongfulness* of his conduct. In his own mind, Moore had done what he was supposed to do—to protect this young girl.

### C. The trial court rejected Moore's NGRI defense.

{¶ 49} The trial court found Moore guilty of all counts, along with their specifications. It rejected Moore's defense that he was not guilty by reason of insanity.

{¶ 50} The court explained that insanity is a narrowly-tailored term limited to situations where as a result of serious mental defect, the defendant did not know the wrongfulness of his conduct. The court observed that all three doctors agreed that a person suffering from mental illness, and specifically schizophrenia, can still understand the wrongfulness of his or her conduct. He specifically relied on Dr. Sherman's opinion that despite believing that Moore was suffering a psychotic episode at the time of the shootings, he was not suffering from the kind of severe defect that would prevent his understanding of the wrongfulness of shooting the boys. The court was not persuaded that Moore's concern and fears that his daughters were being abused constituted proof that he could not understand the wrongfulness of his behavior.

18.

{¶ 51} The court also interpreted Dr. Babula's report as containing contradictions that were not rectified by his testimony. Specifically, Dr. Babula stated that Moore was not "completely incapable of recognizing" the wrongfulness of his behavior, even though the standard for NGRI requires that the defendant "did not know" the wrongfulness of his actions.

{¶ 52} The court found that Moore did not meet the burden of establishing the affirmative defense of NGRI, and therefore, found him guilty of all counts. It sentenced Moore to terms of life in prison without parole on Counts 1 and 2. It merged Counts 3 and 4 for purposes of sentencing, and sentenced him to a minimum prison term of ten years and a maximum indefinite term of 15 years on Count 3. And it imposed a prison term of three years on each of the firearm specifications. The court ordered that the sentences on Counts 1, 2, and 3 be served concurrently, but that each of the terms imposed for the firearm specifications be served concurrently with each other and with the sentences imposed on Counts 1, 2, and 3.

{¶ 53} Moore assigns the following error for our review:

> [T]he Trial Court err[ed] when it found that the Defendant did not prove by a preponderance of the evidence that he was legally insane and did not know the wrongfulness of his actions[.]

## II. Law and Analysis

{¶ 54} Moore argues that the evidence presented at trial was sufficient to support a finding that as a result of a serious mental defect or disease, he did not know the

wrongfulness of his acts. He maintains that the trial court improperly considered issues that were not relevant to determining whether he was legally insane at the time of his criminal conduct, including his conduct at trial. Moore also insists that instead of considering the divergent expert opinions concerning Moore's sanity and determining which opinion was correct, the court improperly substituted its own standard for determining whether Moore was legally insane.

{¶ 55} The state responds that manifest weight—not sufficiency of the evidence—is the appropriate standard of review here because sanity is not an element of the offense that the state must prove; insanity is an affirmative defense that the defendant must prove. It emphasizes that the trial judge as trier of fact could determine what weight to assign the expert testimony and was not required to ignore his own personal observations of the trial evidence. As for Moore's contention that the trial court considered his trial conduct instead of focusing solely on his conduct at the time the offenses were committed, the state maintains that the trial court's comments about Moore's trial conduct were made in connection with sentencing—not in rendering its verdict.

### A. Sanity is an affirmative defense reviewed under a manifest-weight standard.

{¶ 56} Sanity is not an element of an offense that the state must prove. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. Rather, NGRI is an affirmative defense that the defendant must prove. *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 76. "An affirmative defense has no bearing on the

20.

sufficiency of the evidence underlying a conviction." *Id.* at ¶ 127.  Rather, to prevail on this defense, the defendant must prove, by a preponderance of the evidence, "that at the time of the commission of the offense, [he] did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts."  R.C. 2901.01(A)(14) and 2901.05(A). "Proof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense."  R.C. 2945.391.

{¶ 57} When reasonable minds may reach different conclusions on the question of insanity, the question is one of fact.  *State v. Reynolds,* 2017-Ohio-1478, 89 N.E.3d 235, ¶ 48 (6th Dist.), citing *State v. Brown,* 6th Dist. Sandusky No. S-11-031, 2013-Ohio-839, ¶ 13-14.  Where the trier of fact has rejected the defendant's insanity defense, we apply a manifest-weight standard of review.  *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 51.  When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the finder of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  We do not view the evidence in a light most favorable to the state.  "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'"  *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388.

21.

Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### B. The trial court weighed the expert testimony.

{¶ 58} The evidence presented at trial included testimony from three expert witnesses, their reports, and video recordings from body cameras worn by multiple responding officers, the video recording of Moore's behavior while in the police wagon awaiting transportation downtown, and the video recording of Moore's interview with detectives. Of the three experts who evaluated Moore, two of them opined that Moore knew the wrongfulness of his acts. Only Dr. Babula opined otherwise.

{¶ 59} Dr. Babula testified and wrote in his report that "at the time of the acts charged," Moore "did not know the wrongfulness of his actions." Importantly, however, Dr. Babula also stated that Moore "was not completely incapable of recognizing any wrongfulness to his behavior." To prevail on the affirmative defense of NGRI, Moore was required under R.C. 2901.01(A)(14) and 2901.05(A) to prove by a preponderance of the evidence that *he did not know* the wrongfulness of his conduct. Testimony that Moore "was not completely incapable of recognizing any wrongfulness to his behavior" falls short of this and is inconsistent with a claim of legal insanity.

{¶ 60} Dr. Babula tried to explain why he made these seemingly-conflicting statements. He said that Moore may have understood that his conduct was *illegal* without understanding that it was *wrong*. But Ohio courts have recognized that a criminal

22.

defendant cannot prevail on the affirmative defense of legal insanity if he knows that his conduct was illegal.

{¶ 61} In *State v. Myers*, 10th Dist. Franklin No. 09AP-926, 2010-Ohio-4602, for instance, Myers was charged with attempted murder after shooting his wife's ex-husband. Myers, who had been diagnosed with paranoid schizophrenia, told police that the man he shot was part of a cult, had previously threatened him with a gun, and was part of a group that kidnapped his wife and children, replaced them with look-a-likes, and tortured him, drugged him, and hooked him up to a mind-control machine. Before the shooting, Myers had asked local and federal authorities to help him find his family and warned that he would "leave a trail of bodies" if they did not assist him. *Id.* at ¶ 5. The authorities did not respond, so Myers believed that the only way to protect his family was to "exterminate the threat." *Id.* He said that it was his right under the Constitution to protect his children and he did not believe it was against the law to defend his wife and children if authorities refused to act. But Myers acknowledged that he knew the shooting would lead to a criminal investigation and his arrest, and he understood that police would think he committed a crime. He was also aware that police would perform gunshot residue testing.

{¶ 62} At trial, Myers asserted an insanity defense. The trial court rejected his defense and found Myers guilty. The Tenth District affirmed. It observed that Myers's statements demonstrated that he was acting on his own personal justification, "irrespective of its legality." *Id.* at ¶ 18. The court explained that "a defendant suffering

23.

from mental illness cannot avoid criminal responsibility if he knows his conduct 'violates the law and commonly held notions of morality.'" *Id.* at ¶ 13, quoting *State v. Jennings,* 10th Dist. No. 05AP-1051, 2006-Ohio-3704, ¶ 22, citing *People v. MacDowell*, 508 N.Y.S.2d 870 (1986). It concluded that the insanity defense did not relieve Myers of culpability for the shooting because he understood the wrongfulness of his conduct.

{¶ 63} Similarly, in *Jennings*, Jennings was charged with the aggravated murder of one of his friends. At trial, he presented the testimony of an expert psychologist who testified that Jennings suffered from paranoid and grandiose delusions that caused him to believe that the victim was a multiple murderer who would attempt to kill him and others if not stopped. Jennings believed he was the only one who could stop him because police were part of a conspiracy and would not believe him. Jennings compared his conduct to Joan of Arc's crusade against evil. He admitted that he knew it was wrong to kill people but rationalized that Joan of Arc also knew it was wrong to kill people. He explained: "The way I see it, like I said, something had to have been done. Bad people are going to keep doing what they do only if good people do nothing." *Id.* at ¶ 13.

{¶ 64} Jennings's expert psychologist testified that "people can have some kind of awareness that what they're doing is considered legally wrong, yet at the same time they do not consider their actions wrong on the basis of some kind of paranoid delusions and psychotic reasoning." *Id.* at ¶ 15. He opined that Jennings knew his actions were legally wrong, but did not know the "wrongfulness" of his actions within the meaning of R.C. 2901.01(A)(14) because he was convinced that killing the victim was necessary to

24.

prevent him from killing many others.  A three-judge panel rejected Jennings NGRI defense.

{¶ 65} On appeal, the Tenth District framed the issue as "whether a belief, induced through mental illness, that a defendant's actions he or she knows to be contrary to law may nonetheless be the grounds for a not guilty by reason of insanity defense if the defendant believes his or her actions were morally justified." *Id.* at ¶ 20.  The court determined that "knowledge that an act is illegal in most cases will justify the inference of knowledge that it is wrong." *Id.* at ¶ 21, citing *People v. Schmidt*, 216 N.Y. 324, 333-334 (1915).  "If an individual's subjective moral beliefs of 'wrongfulness' conflict with societal standards, the individual may choose either to conform to the laws of society or to suffer the punishment that accrues from ignoring those laws." *Id.*  The court concluded that "if a defendant knows his or her conduct violates the law and commonly held notions of morality, that defendant cannot avoid criminal responsibility when he or she acts on subjective rules even though delusions led him or her to believe he or she was acting as or like a superior power." *Id.* at ¶ 22.  And because the experts' evaluations and Jennings's admissions demonstrated that Jennings knew that he could not legally kill someone, he could not prevail on his NGRI defense despite his belief that his actions were morally justified.

{¶ 66} Here, too, even if Moore knew only that his conduct was "illegal," but did not know that his conduct was "wrongful," he cannot prevail on his defense of NGRI.

25.

Thus, Dr. Babula's attempt to distinguish "illegal" versus "wrongful" conduct is not a distinction that Ohio law recognizes as satisfying its NGRI standard.

{¶ 67} In any event, even if Dr. Babula had testified unequivocally that Moore did not understand that his conduct was wrong, "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of facts." *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). "When expert witnesses differ in their opinions regarding the insanity defense," the finder of fact "must make a credibility determination when deciding which experts to believe." *State v. Petrie,* 2016-Ohio-4941, 69 N.E.3d 150, ¶ 5 (9th Dist.), citing *State v. Murphy,* 4th Dist. Ross No. 15CA3475, 2016-Ohio-1165, ¶ 39. The trial court, as trier of fact, was free to conclude that Drs. Forgac and Sherman were more credible that Dr. Babula.

### C. The trial court did not substitute its own standard or consider improper evidence.

{¶ 68} Moore also contends that instead of considering the divergent expert opinions and determining which opinion was correct, the court improperly substituted its own standard for determining Moore's sanity. He also claims that the trial court considered his trial conduct in evaluating his NGRI defense.

{¶ 69} As an initial matter, the trial court expressly stated that it relied on Dr. Sherman's opinion that even though Moore was suffering a psychotic episode at the time of the shootings, he was not suffering from the kind of severe defect that would prevent

26.

him from understanding the wrongfulness of shooting the boys. Moore is wrong in contending that the trial court failed to determine which expert's testimony was correct.

{¶ 70} In addition to the experts' opinions, the trial court was also presented with recordings from the body cameras worn by multiple responding officers, the recording of Moore's behavior while in the police wagon awaiting transportation downtown, and the recording of Moore's interview with detectives, which took place just hours after the shootings. When the expert witnesses evaluated Moore, he claimed not to remember the incident, but at his interview, Moore had a clear recollection of the chronology of events and that chronology matched the evidence.

{¶ 71} In the recordings the trial court viewed, Moore made the statements that were provided to the expert witnesses. Specifically, during his interview with detectives, (1) Moore said he fired the gun outside so the police would come more quickly, indicating that he knew that he had committed a crime; (2) Moore explained how he had made a reasoned decision to follow the officer's instructions and cooperate in the arrest; (3) although clearly misguided, Moore provided a consistent rationale for his conduct—to put an end to the boys picking on their sister; (4) Moore acknowledged that he wasn't "coming back from this shit," suggesting that he understood the consequences of his actions; and (5) Moore questioned why detectives needed his DNA given that he had already admitted that he had shot the children.

{¶ 72} But unlike the expert witnesses who did not view the video recordings, the trial court had the advantage of observing Moore's mannerisms and tone of voice during

27.

his interview with the detectives. This interview took place within hours of the shootings. When the interview first began, Moore seemed eager to discuss his background. But when it came time to talk about the specifics of the shootings, his mannerisms changed. He went from making eye contact with the detectives and sitting up straight to slouching and holding his head in his hands, rarely looking up or looking directly at the detectives. His tone also changed. He went from speaking quickly and clearly to speaking slowly, flatly, and reluctantly, sometimes refusing to use words to describe his conduct. Often, he answered questions by indicating with his fingers and hands or using nods or shakes of the head instead of verbal responses.

{¶ 73} As trier of fact, the court was charged with weighing the evidence and making credibility determinations. A fact-finder who has the benefit of observing a witness' facial expressions, body language, tone, and voice inflections is in a better position to judge credibility than a person who merely reviews a transcript or listens to a summary of evidence. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Because the recording of Moore's interview was admitted into evidence, the trial court was permitted to consider this evidence in considering Moore's insanity defense. *See Thomas*, 70 Ohio St.2d at 80–81, 434 N.E.2d 1356 (1982) (permitting factfinder to consider lay testimony concerning sanity and finding that jury could properly conclude that defendant knew right from wrong based on victims' testimony that he acted deliberately and rationally at the time of the offenses). The court was not required to set aside its own observations.

28.

**{¶ 74}** Finally, Moore highlights comments made by the court at sentencing, which he insists demonstrate that the court improperly considered his conduct at trial in rejecting his insanity defense. After the court rendered its verdict and in connection with sentencing Moore, the court said:

> [I]n reviewing the evidence in this case in determining what that [sic] the final verdict should be and the outcome, the Court had the occasion to review again the body-worn cameras of the responding officers, your conduct while in the back of the patrol wagon, as well as during the interview process and, quite frankly, I had an opportunity to see your reaction throughout the past two years as you've been present [in] my courtroom for trial proceedings, as well as the trial itself.
>
> It's clear to this Court that at some level you understood the wrongfulness of your actions, which was reflected in the court's verdict today. However, it also should be noted that the same tenor of your letter appeared to have been present at the time that you were being interviewed when you couldn't speak to Detective Mooney about what you had just committed. The horrific nature of it I'm sure plages (sic) you, as it plages (sic) everyone that was associated with this investigation. The fact that you could not look at the videos as they were played in court, you could not look at the images as they were presented to the Court for its consideration, again, goes to your understanding of how dastardly these acts were and

trauma that it's inflicted upon the relatives of these boys, the first

responders that had to deal with the aftermath, and everyone associated

with this prosecution.

Moore maintains that these comments show that the court considered his mannerisms and

conduct during the prosecution of the case instead of focusing only on his sanity at the

time of his alleged conduct.

{¶ 75} As the state points out, the court's comments were made in connection with

sentencing Moore, *after* the court had rendered its verdict. Moreover, the court's

comments simply reinforce that it considered the recordings in weighing the evidence,

and like the letter Moore wrote to be read at sentencing and consistent with his behavior

during court proceedings, those recordings reflect that Moore knew the wrongfulness of

his conduct at the time he committed the shootings.

{¶ 76} We cannot say that the trial court clearly lost its way in resolving

evidentiary conflicts in favor of the state so as to create such a manifest miscarriage of

justice that Moore's conviction must be reversed and a new trial ordered. We find

Moore's assignment of error not well-taken.

### III. Conclusion

{¶ 77} The trial court's rejection of Moore's insanity defense was not against the

manifest weight of the evidence. The state's experts testified that Moore knew his

conduct was wrongful, and Moore's own expert conceded that Moore "was not incapable

of recognizing any wrongfulness to his behavior." Moreover, the court properly weighed

30.

the evidence, including the recordings made in the immediate aftermath of the shootings, and did not substitute its own standard for insanity.

{¶ 78} We affirm the March 20, 2023 judgment of the Lucas County Court of Common Pleas. Moore is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                  _____
JUDGE

Christine E. Mayle, J.            

_____
Charles E. Sulek, P.J.             JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.