OPINION
{¶ 1} Defendant-appellant, Michael J. Jennings, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a three-judge panel verdict, of two counts of aggravated murder with specifications in violation of R.C. 2903.01, aggravated burglary in violation of R.C. 2911.11, and felonious assault in violation of R.C. 2903.11. Because defendant received the effective assistance of counsel, and because the sufficiency and manifest weight of the evidence support defendant's convictions, we affirm.
 {¶ 2} According to the state's evidence, Brian Bass, Gary McMurtry, Scott Kohl, and Brian Balk lived together at 3485 Indianola Avenue ("residence") in May 2002. McMurtry ran Columbus Eagle, a bar featuring male entertainment strip shows; Bass served as its bartender, Kohl functioned as its a disc jockey, and Balk worked as a stripper. Defendant intermittently stripped at the bar for seven or eight years, usually dressed in a soccer or ninja costume. Defendant considered all four roommates to be his friends and visited as often as once or twice a week. Defendant never lived at the residence and was never romantically involved with any of the four roommates.
 {¶ 3} On May 17, 2002, Bass and McMurtry finished working at the bar, returned home around three in the morning, and retired for bed an hour later; Kohl and Balk were out of town. Bass testified that he awoke a few hours later to McMurtry's yelling, "Help, get him off of me, help." (Tr. Vol. I, 44.) As Bass opened his bedroom door, someone that Bass later identified as defendant approached in a ninja costume. After a brief struggle with Bass, defendant pulled swords out of his sheath and cut Bass's outstretched hands. Bass fell back onto his bedroom floor, kicked the door closed, wrapped his hand, and called 9-1-1. Once Bass could safely exit his bedroom, he checked on McMurtry who was "laying on the floor, balled up"; Bass ran into the street calling for help. (Tr. Vol. I, 45.)
 {¶ 4} Two witnesses testified that, as they stood in a friend's driveway getting ready for a golf trip, they saw a man in a ninja outfit run by at approximately seven in the morning on May 17, 2002. The man was running away from Indianola Avenue and toward the river. Another neighbor testified she observed a man dressed in black, with a black mask, running toward her the same morning. The man, who kept looking behind as he ran, carried over his right shoulder a black backpack with swords and a weapon.
 {¶ 5} After police officers warned a Columbus city electrician to look out for an armed man dressed in black who was roaming the area, the electrician saw a man in black walking toward his job site on High Street. The electrician followed the man, sent for help, and watched police arrest him. Detective William Snyder responded to the arrest scene and processed the contents of defendant's backpack, which included clothing, masks, two swords, two short knifes, a pistol-style crossbow, bags of flour, tubes containing pepper, shoes, numbchuks, throwing stars, a flare, and particles of glass. Snyder collected dirt and vegetation off defendant's shoes and made inked impressions for processing. Additional evidence collected from the residence included footprints, glass fragments from the rear door, a rock found on a couch near the rear door, and swabs of blood.
 {¶ 6} Karen Kwek, the lab director for the Bureau of Criminal Investigation ("BCI"), testified that the glass fragments obtained from defendant's backpack were indistinguishable from the fragments taken from the glass door at the residence. Heather McClellan, a criminalist for the Columbus Police Department's Crime Lab, testified that the shoes recovered from defendant's backpack could have made the footprint left at the residence. Amorena Clarkson, a criminalist for the Columbus Police Department's Crime Lab, testified that McMurtry's DNA matched the DNA taken from the blood on defendant's sword and knife. The parties stipulated to the coroner's report that concluded McMurtry died from stab wounds to his heart and liver.
 {¶ 7} By indictment filed on May 23, 2002, defendant was charged with one count of aggravated burglary, two counts of aggravated murder with specifications, attempted murder, and felonious assault. Defendant was deemed incompetent to stand trial for nearly two years before he regained competency, waived his right to a jury trial, and was tried before a three-judge panel. After a four-day trial, the panel delivered its verdicts finding defendant guilty of aggravated burglary, two counts of aggravated murder with specifications, and felonious assault. After a mitigation hearing, the court imposed a sentence of 25 years to life for the aggravated murder charges, a three-year sentence on the aggravated burglary charge, and a two-year sentence on the felonious assault charge, to be served concurrently.
 {¶ 8} Defendant appeals, assigning three errors:
First Assignment of Error: Appellant established that he was not guilty by reason of insanity by a preponderance of the evidence. The three-judge panel's verdict was against the manifest weight of the evidence.
Second Assignment of Error: Appellant established he was not guilty by reason of insanity by a preponderance of the evidence. The three-judge panel's verdict was not supported by the evidence.
Third Assignment of Error: Counsel's failure to file and pursue a motion to suppress statements denied appellant the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution.
 {¶ 9} Defendant's first assignment of error contends the verdict is against the manifest weight of the evidence because defendant proved by a preponderance of the evidence that he is not guilty by reason of insanity. When presented with a manifest weight challenge, the appellate court engages in a limited weighing of the evidence to determine whether sufficient, competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. To make the determination, the court reviews the entire record as the "thirteenth juror" and decides whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 10} A defendant's sanity is not an element of aggravated murder; the state need not prove that a defendant was sane at the time of the crime. State v. Hancock, 108 Ohio St.3d 57,2006-Ohio-160, at ¶ 35. Insanity is an affirmative defense that must be proven by a preponderance of the evidence. State v.Taylor, 98 Ohio St.3d 27, 2002-Ohio-7017; R.C. 2901.05(A). The accused must persuade the trier of fact that "at the time of the commission of the offense, the [accused] did not know, as a result of a severe mental disease or defect, the wrongfulness of the [accused's] acts." Hancock, at ¶ 35, quoting R.C.2901.01(A)(14).
 {¶ 11} Because both parties agree that defendant suffered from a severe mental disease at the time of the offense, the issue resolves to whether defendant's mental disease prevented him from knowing the wrongfulness of his conduct. Although defendant knew that killing McMurtry was illegal, defendant maintains that R.C. 2901.01(A)(14) does not limit "wrongfulness" to a legal standard but more broadly encompasses a moral standard. Defendant claims that because he believed McMurtry was trying to kill him, and irrationally thought killing McMurtry was morally justified as self-defense, defendant did not know the wrongfulness of his acts. Defendant thus concludes the verdict is against the manifest weight because the trial court implicitly accepted the opinion of the state's expert witness that defendant knew his acts were legally wrong, but failed to consider the opinion of defendant's expert witness that defendant believed his acts were morally justified.
 {¶ 12} At trial, defendant presented the evidence of Dr. Eshbaugh, a clinical and forensic psychologist, to prove his insanity pleas. Dr. Eshbaugh testified that defendant suffered from paranoid and grandiose delusions that focused on McMurtry and caused defendant to believe McMurtry was a multiple murderer who would attempt to kill defendant and others if defendant did not act. Defendant felt he was the only one who could stop McMurtry, because the government and police were part of a conspiracy against him and would not believe him.
 {¶ 13} Dr. Eshbaugh testified that defendant compared his "war" against McMurtry to Joan of Arc's "crusade" against evil. Defendant stated that he knew it was wrong to kill people but "Joan of Arc knew it was wrong to kill people which is why they defended themselves against England. They ended up killing people but in self-defense." (Tr. Vol. II, 408.) Defendant further stated, "Would anybody say what Joan of Arc did was murder because they attacked the English, what had happened to them on their own turf? You know, it was something argued back in her time. The way I see it, like I said, something had to have been done. Bad people are going to keep doing what they do only if good people do nothing." Id.
 {¶ 14} As justification for his actions, defendant told Dr. Eshbaugh, "I felt if I had to kill those two people [referring to McMurtry and his roommate Scott Kohl], who are multiple murderers, from killing again, then more people would be alive. No one else would die by their hands. If that's wrong, then I'm screwed by the people who are in this position of power over me. But because the government says it's not self-defense, therefore it must be wrong. I don't believe it to be true." (Tr. Vol. II, 409.)
 {¶ 15} Based on these and other conversations with defendant, Dr. Eshbaugh testified that defendant "had a severe mental disease at the time the charges were incurred, and because of that mental disease, he did not know the wrongfulness of his actions." (Tr. Vol. II, 377.) To arrive at the second half of his conclusion, Dr. Eshbaugh considered whether defendant knew the legal and moral wrongfulness of his actions and agreed "it would be possible for someone to understand that it's not legal to kill someone but would not know the wrongfulness of doing that fact on a moral basis[.]" (Tr. Vol. II, 378.) He later explained "that people can have some kind of awareness that what they're doing is considered legally wrong, yet at the same time they do not consider their actions wrong on the basis of some kind of paranoid delusions and psychotic reasoning." (Tr. Vol. II, 424.) Dr. Eshbaugh believed that defendant knew his actions were legally wrong, but defendant did not know the "wrongfulness" of his actions within the meaning of R.C. 2901.01(A)(14) because he was convinced that killing McMurtry was necessary and right to prevent McMurtry from killing many others. According to Dr. Eshbaugh, defendant was "on a mission to do the right thing" and invoked a vigilante-type of self-defense. (Tr. Vol. II, 411.)
 {¶ 16} On the other hand, the state's forensic psychiatrist, Dr. Fettman, testified that defendant knew the wrongfulness of his actions. Dr. Fettman primarily based his opinion on defendant's actions leading up to and following the murder: "[defendant] broke into this apartment at a time when it was secluded, there were not people around. He went in, killed Gary McMurtry, left, tried to cover it up, tried to elude police, was eventually caught by police, [and] denied that he had committed this crime." (Tr. Vol. II, 519-520.) During his interrogation, defendant "knew that he had committed this crime, and yet he indicated that he hadn't and acted very calmly as if he didn't know anything about it and wasn't at all involved with it. Those actions speak very loudly." (Tr. Vol. II, 520.)
 {¶ 17} After reviewing the videotape of his interview with defendant, Dr. Fettman testified that defendant "more or less reconfirmed the idea that * * * he did not want to get caught, he did not plan to get caught." (Tr. Vol. II, 523.) Defendant advised Dr. Fettman that defendant lied to police about his involvement in the crime because "he felt that the police didn't have enough evidence to charge him," and he "wanted to try to get away with it. [He] didn't want to get caught, arrested and taken to jail." (Tr. Vol. II, 523, 526.)
 {¶ 18} According to Dr. Fettman, "[defendant] knew right from wrong, but he didn't think it was wrong. He felt he had to lie so he could tell his story [of self-defense] later." (Tr. Vol. II, 525.) Defendant informed Dr. Fettman he did not tell the police the self-defense theory he related to Dr. Eshbaugh because "it would be his word against theirs and that it would be totally fruitless * * *"; instead, "[he] took advantage of the time and did it." (Tr. Vol. II, 526, 527.) Defendant admitted to Dr. Fettman that the whole plan was not well thought out: "If it was, I would have gotten away with it." (Tr. Vol. II, 528.)
 {¶ 19} Dr. Fettman also based his opinion on defendant's own admissions. Defendant acknowledged to Dr. Fettman that "he knew that these things were wrong. He said that in his mind, they didn't feel they were wrong, but he knew that in the eyes of authority that they were wrong and that he could be punished and go to jail, be found guilty by authorities if he were caught." (Tr. Vol. II, 520.) When Dr. Fettman asked defendant if he knew that killing someone was wrong, defendant replied "I know killing someone is wrong but I saw no other alternative. What I was doing was wrong. It was my struggle. I felt like I needed to do this. I knew the difference between right and wrong at that time[.]" (Tr. Vol. II, 570-571.)
 {¶ 20} No Ohio case law directly addresses the argument defendant raises: whether a belief, induced through mental illness, that a defendant's actions he or she knows to be contrary to law may nonetheless be the grounds for a not guilty by reason of insanity defense if the defendant believes his or her actions were morally justified. R.C. 2901.01(A)(14), as defendant contends, includes a concept of moral "wrongfulness," but the issue is the extent to which a subjective belief that criminal activity is morally justified permits a defendant to invoke R.C. 2901.01(A)(14), a statute designed to ascertain a defendant's true capacity to appreciate the wrongfulness of his or her actions.
 {¶ 21} The concept of "wrongfulness," including its moral component, generally is defined according to and is reflected in society's laws. As a result, what is morally wrongful in society's view usually will be co-extensive with and embodied in society's laws. Indeed, laws at their very root are a society's collective moral beliefs, developed over time, to prescribe the standards by which citizens interact with each other. An offense against the law, according to the accepted standards of society, is also condemned as an offense against good morals. See Peoplev. Schmidt (1915), 216 N.Y. 324, 340. As Judge Cardozo stated, "[o]bedience to the law is itself a moral duty." Id. As a result, knowledge that an act is illegal in most cases will justify the inference of knowledge that it is wrong. Id. at 333-334. If an individual's subjective moral beliefs of "wrongfulness" conflict with societal standards, the individual may choose either to conform to the laws of society or to suffer the punishment that accrues from ignoring those laws.
 {¶ 22} In some limited instances, a defendant, even though he or she recognizes his or her actions to be legally wrong, may not know the wrongfulness of his or her actions because that defendant acts not on his or her subjective beliefs, but "under the delusive but sincere belief that what he is doing is by the command of a superior power, which supercedes all human laws, and the laws of nature." Schmidt, at 336. In those instances, "it cannot be said of the offender that he knows the act to be wrong." Id. at 340. By contrast, if a defendant knows his or her conduct violates the law and commonly held notions of morality, that defendant cannot avoid criminal responsibility when he or she acts on subjective rules even though delusions led him or her to believe he or she was acting as or like a superior power. SeePeople v. MacDowell (1986), 508 N.Y.S.2d 870 (finding a woman criminally responsible for her actions, despite her delusional belief that she was "Jezreel, Lord God Woman," because she followed her own rules though she knew her conduct violated the law and commonly held notions of morality).
 {¶ 23} Here, both experts' evaluations and defendant's own admissions demonstrate that defendant knew he could not legally kill McMurtry. Despite defendant's contentions that his mental illness caused him to believe his actions nonetheless were morally justified, defendant's knowledge that the act was illegal, coupled with his actions following the murder, justify the court's inference that defendant knew the act was wrong: defendant's actions in seeking to conceal the murder and escape punishment indicate that defendant indeed understood that society would morally condemn his actions. While defendant's mental illness may have induced him to believe his "war" against McMurtry was like Joan of Arc's crusade against evil, defendant, like the accused in MacDowell, followed his own subjective rules of morality; he merely compared his reasoning to that of Joan of Arc to justify his actions. As a result, like the accused in MacDowell, no higher power "ordained" that defendant commit murder, and defendant had sufficient intelligence and understanding to know his acts were against society's legal and moral standards.
 {¶ 24} Defendant therefore is unable to escape criminal responsibility for what he knows to be legally wrong by assuming a cloak of personal belief that his actions were morally justified, even if the belief arises from mental illness. R.C.2901.01(A)(14) does not permit individuals who know what is legally wrong to eschew the law and operate under a standard of morality they set for themselves. To allow a defendant to exonerate himself or herself based on personal beliefs, yet ignore the defendant's capacity to conform his or her conduct to the law, would eviscerate the laws supporting the structure of society.
 {¶ 25} Defendant's first assignment of error is overruled.
 {¶ 26} Defendant's second assignment of error contends the evidence is insufficient to support the verdict because defendant proved by a preponderance of the evidence that he is not guilty by reason of insanity. Defendant does not dispute that the evidence sufficiently proves beyond a reasonable doubt every element of aggravated murder with the accompanying specifications, aggravated burglary, and felonious assault. Defendant instead claims the evidence "overwhelmingly" proves that he was not guilty by reason of insanity.
 {¶ 27} Generally, sufficiency of evidence inquires "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Goodwin (1999), 84 Ohio St.3d 331, 343-344, quoting State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The verdict will not be disturbed unless it is determined that reasonable minds could not have reached the conclusion reached by the trier of fact. Goodwin, at 344.
 {¶ 28} A sufficiency-of-the-evidence review, however, does not apply to the affirmative defense of insanity. Hancock, at ¶ 37-38. "[T]he due process `sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." Id. at ¶ 37, quoting Caldwell v.Russell (C.A.6, 1999), 181 F.3d 731, 740. A sufficiency-of-the-evidence review "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Hancock, at ¶ 38, quoting Jackson v.Virginia (1979), 443 U.S. 307, 324. Because the insanity defense does not involve "the substantive elements of the criminal offense," a sufficiency-of-the-evidence review does not apply to it. Hancock, supra.
 {¶ 29} Although defendant challenges the ruling in Hancock,
this court is bound by and must follow applicable Ohio Supreme Court decisions. World Diamond, Inc. v. Hyatt Corp. (1997),121 Ohio App.3d 297, 306. Because the Ohio Supreme Court held inHancock that a criminal defendant may not challenge that portion of the verdict pertaining to his insanity defense on the basis of the sufficiency of the evidence, defendant's second assignment of error is overruled.
 {¶ 30} Defendant's third assignment of error contends the failure of defendant's counsel to file and pursue a motion to suppress the statements defendant made to police the morning of his arrest denied defendant the effective assistance of counsel. Defendant claims the police belatedly and incompletely advised defendant of his Miranda rights and defendant never verbally agreed to waive his rights. Noting that the statements made to the police the morning of his arrest formed the pillars of the state's rebuttal to defendant's not guilty by reason of insanity defense, defendant concludes that had counsel suppressed the statements, the trial likely would have resulted in a different outcome.
 {¶ 31} A defendant alleging ineffective assistance of counsel must demonstrate (1) defense counsel's performance was so deficient that he or she was not functioning as the counsel guaranteed under the Sixth Amendment to the United States Constitution, and (2) defense counsel's errors prejudiced defendant, depriving him or her of a trial whose result is reliable. Strickland v. Washington (1984), 466 U.S. 668, 687;State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011. The first prong requires a defendant to overcome a strong presumption that, under the circumstances, the challenged action might be considered a sound trial strategy. Strickland, supra. Even if counsel's error is unreasonable under prevailing professional standards, it does not warrant setting aside a judgment unless the error affected the outcome of the trial. Id. at 691. Thus, under the second prong of Strickland, a defendant must show that counsel's deficient performance prejudiced the defense. Id. This requires a showing that but for counsel's errors, a reasonable probability existed that the result of the trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 32} Here, defendant claims his trial counsel was ineffective for failing to suppress statements that (1) revealed defendant's efforts to avoid detection, and (2) showed defendant intentionally lied to police to escape prosecution. Were we to assume defendant's statements were elicited in violation of hisMiranda rights, and further conclude that admitting defendant's statements was outside a sound trial strategy, defendant nonetheless is unable to demonstrate how the suppression of the statements would likely change the outcome of the trial.
 {¶ 33} Even if defendant's counsel successfully suppressed defendant's statements from the morning of his arrest, several witnesses corroborated defendant's statements through testimony describing defendant's flight from the crime scene, defendant's clandestine outfit, forensic evidence tying defendant to the scene of the crime, and defendant's subsequent confessions that he initially lied to the police. Such evidence, independent from defendant's statement at issue, was sufficient to support defendant's convictions. Additionally, although Dr. Fettman used the police interrogation to rebut defendant's insanity defense at trial, Dr. Fettman also reviewed defendant's police files, prosecution files, mental health history, and his conversations with defendant before drawing his conclusion. Because sufficient additional evidence duplicated the information derived from the police interrogation and supported Dr. Fettman's conclusion, a successful motion to suppress defendant's statements from the morning of his arrest would not have altered the outcome of the trial. Accordingly, defendant's third assignment of error is overruled.
 {¶ 34} Having overruled defendant's three assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Brown and Sadler, JJ., concur.