[Cite as *State v. Anderson*, 2025-Ohio-1673.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee/Cross-Appellant | : | C.A. No. 30211 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 02121 |
| | : | |
| DANIEL ANDERSON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant/Cross-Appellee | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on May 9, 2025

. . . . . . . . . .

MICHAEL MILLS, Attorney for Appellant/Cross-Appellee

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee/Cross-Appellant

. . . . . . . . . . . .

HANSEMAN, J.

{¶ 1} Defendant-Appellant, Daniel Anderson, appeals from his conviction of murder, which followed the trial court's determination that he was guilty of several counts of murder and felonious assault. The trial court merged all of the convictions and

sentenced him on one count of murder. The State has also filed a cross-appeal.

{¶ 2} According to Anderson, the trial court should have found him not guilty by reason of insanity because overwhelming evidence showed he did not understand, at the time of the commission of the crimes, that his conduct was wrongful. Anderson further argues that trial counsel rendered ineffective assistance by failing to have him testify about his state of mind at the time of the offenses.

{¶ 3} In support of its cross-appeal, the State contends the trial court erred in merging Count Nine (felonious assault) with Count One (murder) because each offense was committed separately and caused separate, identifiable harm.

{¶ 4} After reviewing the record, we conclude that the trial court did not err in rejecting Anderson's insanity defense. While both experts agreed that Anderson suffered from a severe mental disease, they disagreed about whether Anderson, due to the disease, failed to understand at the time of the offense that his conduct was wrongful. The court found Anderson's expert was not credible on this issue and that the State's expert was credible. The court's judgment on the insanity defense was not against the manifest weight of the evidence.

{¶ 5} We further find that trial counsel did not render ineffective assistance by failing to have Anderson testify about his state of mind at the time of the crime. A video of Anderson's lengthy interview by the police immediately after the crime was admitted into evidence, and he also self-reported facts about his state of mind to both experts. In addition, a defendant's right to testify is inherently personal and is exercised by the defendant, not by counsel. Thus, when a tactical decision is made not to have the

defendant testify, the defendant's assent is presumed.

{¶ 6} Finally, concerning the State's cross-appeal, we conclude that the court erred in merging one of Anderson's felonious assault convictions with his murder conviction. Anderson's actions as relevant to this charge caused separate, identifiable harm to the victim, and it was a separate offense. Accordingly, the trial court's judgment will be affirmed except with respect to a single count of felonious assault (Count Nine); although we do not disturb the trial court's finding of guilt on Count Nine, this matter will be remanded for resentencing relating the merger of that offense.

## I. Facts and Course of Proceedings

{¶ 7} On August 5, 2022, an indictment was filed charging Anderson with five counts of murder and four counts of felonious assault. Prior to the indictment, the Office of the Public Defender entered an appearance on Anderson's behalf. Anderson pled not guilty to the charges, and the court set bail in the amount of $1,000,000, surety bond. Shortly thereafter, defense counsel asked the court to order a competency and sanity evaluation of Anderson and also entered a plea of not guilty by reason of insanity ("NGRI"). The court then, on August 17, 2022, ordered the Forensic Psychiatry Center for Western Ohio to examine whether Anderson was competent to stand trial and whether he was insane at the time of the alleged offenses.

{¶ 8} After the court received the evaluation report, it ordered a second evaluation of Anderson's competency, to be done by Dr. Nichting. Order for Second Opinion Examination for Competency and Sanity (Oct. 5, 2022). After receiving Nichting's report,

the court found Anderson incompetent to stand trial at that time. However, the court also found a substantial possibility existed that Anderson could be restored to competency within the statutory time limits. The court, therefore, committed Anderson to Summit Behavioral Healthcare for treatment and further ordered that he be returned to the Montgomery County Jail once restoration treatment was complete. Order Committing Defendant to Summit Behavioral Healthcare on Incompetent – Restorable Findings (Nov. 14, 2022), p. 1-2.

{¶ 9} After receiving Summit's updated evaluation report indicating that Anderson had been restored to sanity, the court found by clear and convincing evidence that Anderson was competent to stand trial. At that time, the court also ordered Anderson's continued confinement at Summit so he could receive medication and/or appropriate treatment to maintain competency pending further disposition. Order Authorizing Confinement at Summit Behavioral Healthcare to Maintain Competency (Apr. 3, 2023). On April 6, 2023, the court also ordered that Dr. Nichting examine Anderson again and provide a second opinion about his sanity at the time of the crime.

{¶ 10} A jury trial was ultimately set for May 20, 2024, but on May 16, 2024, Anderson filed a written waiver of his right to a jury trial on all counts of the indictment. The case was then tried to the court. After hearing the evidence, the court rejected Anderson's NGRI defense and found him guilty of all offenses as charged. During the sentencing hearing, the court merged all the convictions and sentenced Anderson to 15 years to life on one count of murder. The court disagreed with the State's argument that the felonious assault charge in Count Nine was not subject to merger. As noted, Anderson

appealed from the judgment, and the State filed a cross-appeal on the merger issue. Additional facts will be discussed when we consider the issues the parties have raised.

## II. Insanity Defense

{¶ 11} Anderson's first assignment of error states that:

The Trial Court Erred in Finding the Appellant Failed to Meet His Burden to Establish the Affirmative Defense of Not Guilty by Reason of Insanity as There Was Overwhelming Evidence Offered at Trial That the Appellant Did Not Understand the Wrongfulness of His Action During the Commission of the Offense.

{¶ 12} Under this assignment of error, Anderson contends the trial court misapplied the NGRI standard by heavily weighing Anderson's statements and actions after the offense was committed rather than focusing on his state of mind at the time of the offense. Anderson further stresses that his expert, Dr. De Marchis, concluded that due to severe mental disease, Anderson did not know the wrongfulness of his actions when the offense was committed.

{¶ 13} "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). As relevant here, R.C. 2901.05(A) provides that "[t]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a

preponderance of the evidence . . . is upon the accused." "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed.1998).

{¶ 14} Although Anderson did not discuss a specific standard of review in his brief, courts have held that a manifest weight analysis applies in this situation. *See State v. Hancock*, 2006-Ohio-160, ¶ 34-39 (rejecting a sufficiency analysis because insanity is an affirmative defense and does not relate to a crime's substantive elements). *See also, e.g.*, *State v. Moore*, 2024-Ohio-994, ¶ 56 (6th Dist.); *State v. Schmid*, 2025-Ohio-14, ¶ 20 (2d Dist.) (applying manifest weight, not sufficiency). "To warrant a reversal from a bench trial verdict under the manifest weight of the evidence claim, it must be determined that the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *State v. Mills*, 2006-Ohio-4010, ¶ 11 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 15} In conducting this analysis, the court reviews "the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses" to decide if the fact-finder lost its way. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. "Typically, in manifest weight review, we defer to trial court decisions on credibility issues, as those courts are in the best position to make that determination." *State v. Jonas*, 2020-Ohio-4236, ¶ 21 (2d Dist.), citing *State v.*

*Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). We also bear in mind that "in a bench trial, 'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *SST Bearing Corp. v. Twin City Fan Cos., Ltd.*, 2012-Ohio-2490, ¶ 16 (1st Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *Accord Emswiler v. Bodey*, 2012-Ohio-5533, ¶ 44 (2d Dist.).

**{¶ 16}** The evidence established the following facts. The crime occurred on July 28, 2022, at Deed's Point Dog Park (formerly Triangle Park), when Anderson attacked the victim, Daniel Thomas, with a machete. Anderson then ran over Thomas with his automobile. At the time, Anderson was homeless and had been sleeping at the park for about two weeks. According to what Anderson told the police the night of the crime, Thomas kept showing up at the park. Anderson used speed or crystal amphetamine with Thomas the first time they met and took a "bunch" of the drug on another occasion (two or three days before the crime), saying it made him high. State's Ex. 71 (Report of Dr. Nichting), p. 6 and 11; Defendant's Ex. A (Report of Dr. De Marchis), p. 4.

**{¶ 17}** From evidence found on Anderson's cell phone, the first documented contact between the two men was a text that began at 1:18 a.m. on Wednesday, July 20, 2022.

**{¶ 18}** Two days later (in the early evening of July 22, 2022), Anderson purchased a serrated machete and LED flip light switch at Harbor Freight Tools in Dayton, Ohio. Tr. at 17-26; State's Exs. 1A, 1B, 1C, and 2.   The next documented phone contact between the men occurred on Wednesday, July 27, when Anderson called Thomas at 2:03 p.m.,

but cancelled the call. He immediately texted Thomas, stating, "Didn't mean to call." Thomas then responded, "Your ok how ya feeling?" Tr. 147-148; State's Exs. 66B, 66C, and 66D. Anderson did not reply until 10:51 a.m. on July 28 (the day of the murder). At that time, he said, "I was high for days." At 4:05 p.m., Thomas replied, "It hasnt been 24 hours yet." Finally, at 9:34 p.m., Anderson texted, "I'm having trouble swallowing," to which Thomas responded, "Dont swallow." *Id.* at State's Ex. 66C. This was the last documented phone contact before the murder.

{¶ 19} On July 28, J.C. arrived at the dog park around 10:30 p.m. to walk his dogs. J.C.'s car was equipped with five dash cams facing in different directions that captured Anderson's car and Thomas's arrival at the park. At 11:05 p.m., the video showed Anderson's car parked. Around 11:05 to 11:06 p.m., Thomas's vehicle, a silver 2007 Dodge Dakota truck, entered the parking lot and exited to the right. Thomas then returned around 11:42 p.m. and backed into a parking spot. At around 11:50 p.m., J.C. heard a loud commotion and saw Thomas fall to the ground. He initially thought Thomas was working on his truck, so he stayed inside the dog park for about five more minutes. At that point, he walked over to Thomas to ask if he needed help with the truck, because Thomas was sitting or lying on the ground. J.C. found Thomas convulsing in a pool of blood and called 911. As J.C. came up to the victim, Anderson walked up from outside a nearby shelter and looked at J.C. Anderson was expressionless and did not say anything. He (Anderson) took a seat in the shelter and patiently waited for the emergency services to arrive. Tr. at 29, 31-32, 33-38, 123, 129, and 150-152.

{¶ 20} The video cameras on J.C.'s vehicle showed Anderson moving his car and

circling around the lot at around 11:55 p.m. In addition, the video showed Anderson's car turning toward where Thomas's body was laying. The car's reverse lights came on, and then it turned around and came back to its parking spot. Anderson then exited the car. *Id.* at 40 and 151-152. There was no dispute about the fact that Anderson ran over Thomas with the car.

{¶ 21} A fire department ladder truck was the first to arrive on the scene, around midnight, and a medic declared Thomas dead at 12:01 a.m. Bruce Butt, a fire captain and paramedic, was on the ladder truck and approached the shelter. As he did so, he saw Anderson with his hands up, as if he were surrendering. Butt told Anderson it was a crime scene and asked if he knew what had happened. Anderson explained he "had done it." Due to the amount of blood, Butt assumed a gun had been used. However, when he asked Anderson where the gun was, Anderson said, "I didn't use a gun. I used a machete." Anderson motioned with his head toward the picnic table area where a machete was laying on a table. After ascertaining that Anderson did not have any weapons on his person, Butt told him to sit down at a picnic table away from the machete. He then stayed with Anderson until the police arrived. On the way to the table, Butt asked Anderson if the other man had attacked him. Anderson replied no, that the man had taken him to the store last week, and then this week, the man came up to Anderson and said he knew personal information about Anderson's family and had raped Anderson's mother. *Id.* at 60-62 and 64-65.

{¶ 22} Officer Palmer of the Dayton Police Department ("DPD") arrived at the scene around 12:04 a.m. and was signaled to come to the shelter. After Captain Butt

gave Palmer information, Palmer told Anderson to "pop up for him." At that point, Anderson turned around, facing away from Palmer, and put his hands behind his back. Palmer then handcuffed Anderson and placed him in the cruiser. Tr. at 76-81.

{¶ 23} Detective Tyler Hofacker of the DPD homicide unit was assigned as the lead detective on the case. After viewing the scene, Hofacker went to the Safety Building, where he and another detective interviewed Anderson for about an hour and fifteen minutes. During the interview, Anderson waived his *Miranda* rights, signed consent forms for searches of his phone and car, and provided a DNA swab. *Id.* at 122-123, 132-137, and 145; State's Ex. 59 (video of the interview).

{¶ 24} Dr. Harshbarger, the Montgomery County Coroner, testified about the autopsy that was performed on Thomas on July 29, 2022. Harshbarger identified many deep sharp force, blunt force, and sharp force injuries to Thomas's face, both sides of the scalp and skull, left side of the neck, right shoulder, right arm, left and right hands and finger, right ear, left side of the chin, cervical spine and cervical vertebrae four. *Id.* at 174, 179, and 181-193. The doctor also identified other injuries that had been caused by a high degree of compression consistent with a car, not a machete, and included right and left clavicle fractures, left side fractures of ribs one through 11, and right side rib fractures of two through 10. Bleeding from these injuries meant they were caused before death. *Id.* at 194-196.

{¶ 25} Two psychologists testified and stated they had reviewed various information, including Anderson's prior psychiatric records and competency evaluations and police reports about the crime. Both had also interviewed Anderson twice. In addition,

Dr. Nichting watched the video of the July 29, 2022 police interview; Dr. De Marchis did not. Both doctors agreed that Anderson suffered from a serious mental disease at the time of the crime. However, they differed on whether, because of the disease, Anderson failed to know the wrongfulness of his acts. Tr. 202-204, 213, 221, 225, 237-248, and 258.

{¶ 26} There was no question that Anderson had a serious mental illness and that he was experiencing active symptoms at the time of the crime. According to his father, Anderson began having mental issues in 2020. Before July 29, 2022, Anderson had been hospitalized on several occasions for psychiatric situations, including threats Anderson had made to his brother because he believed his brother had raped someone. Anderson had also pulled a knife on his father due to a delusion about a rape. During these hospitalizations, various diagnoses were made, including "schizoaffective," schizophrenia, bipolar disorder, and "schizophreniform." Anderson's delusions mainly centered on rape. For example, during his police interview, Anderson was preoccupied with rape and people who rape. In addition, he talked a lot about past lives and rapists being involved in those lives. *Id.* at 161-162,164, 207, 240, 261; Ex. A and Ex. 71.

{¶ 27} As noted, the trial court found in mid-November 2022 that Anderson was not competent to stand trial, but that he could be restored to competency within a reasonable time. Before that occurred, Anderson, using the jail's email system, replied on August 10, 2022, to an email sent to him by someone named C.C. Anderson's email was titled "Welp," and stated that:

> No I'm probably pleading insanity, and yeah i confessed everything

right off the bat, i told them exactly what happened, i was kinda hoping at first to help myself by just being honest but idk I should have just left, like i could have easily gotten away with it, there wouldn't have been shit linking me to it, i just was worried someone else would find it then get in trouble for it when I did it.

Tr. at 157-159; State's Ex. 70, p. 2.

{¶ 28} Dr. De Marchis's interviews with Anderson took place on September 8 and 12, 2022. During interviews with De Marchis, Anderson expressed delusional thoughts about powerful machines that simulated the world and his belief that he had been caught in such a machine and had been killed on several occasions, once even by crucifixion. Anderson also explained that someone was using a machine to rape everyone and that it had simulated his grandfather raping his grandmother so that Anderson was forced to watch it. In addition, Anderson believed he had been raped in previous lives. Tr. at 205-206. At the scene of the crime, Anderson told the firefighter and the first officer who talked to him that he killed Thomas because Thomas had said he had raped Anderson's mother; later, Anderson told the police the same thing during his interview and added that he killed Thomas because Thomas said he was going to rape Anderson's family members. Anderson subsequently said the same things to Dr. De Marchis and Dr. Nichting. *Id.* at 62, 87, 162, 208-209, 245; Ex. A, p. 4, Ex. 71, p. 7, and Ex. 59.

{¶ 29} In finding that Anderson did not know his actions were wrongful due to severe mental disease, Dr. De Marchis relied on these points: (1) Anderson felt compelled to protect his family members from harm; (2) Anderson believed he would be released

once the real story came out and that he would be commended; and (3) Anderson did not leave the scene, readily confessed, and did not hide the weapon. The doctor discounted these facts: (1) Anderson told police within two hours of committing the murder that he knew he was going to prison for a very long time; (2) purchasing the machete was a planned and purposeful act; and (3) Anderson stated during his police interview that he knew murder was wrong. Tr. at 209 and 216-219.

{¶ 30} In contrast, Dr. Nichting concluded that despite his severe mental illness, Anderson knew his actions were wrongful. She based this on the following evidence of knowledge of wrongfulness: (1) Anderson consistently acknowledged that he had engaged in the behavior to kill the victim; (2) Anderson self-reported that when he saw the victim again in the park, he went to his car to get the machete and hid it under a blanket so it would not be seen. This indicated knowledge that a weapon would have caused the victim to feel fear as he approached, and knowledge of wrongfulness by hiding the weapon to prevent the victim from seeing it; (3) Anderson knew another person was in the park at the time and did not want to scare that person; (4) records suggested Anderson had said he planned to use the machete a day or so before he used it, and this indicated purposeful planning; (5) by Anderson's self-report, he knew the severity of his actions in that he wanted to make it orderly, did not want to torture the victim, and felt horrible doing it; (6) Anderson held his hands in the air for the first responders before being told to do so and turned around to be handcuffed before being told to do so; (7) Anderson commented to officers that he was going to prison for a long time, possibly life; (8) Anderson acknowledged that murder is wrong; and (9) Anderson smoked a cigarette

in the shelter while waiting for the police and stated he knew it would be his last because he knew he was going to prison. *Id.* at 246-253 and 255. Nichting discounted Anderson's statement that he was proud of what he had done and believed there would be a celebration. In this regard, she distinguished between assertions of moral justification and knowledge of legal wrongfulness. *Id.* at 250-253 256, and 267.

{¶ 31} After hearing the testimony, the trial court orally announced its bench trial decision on June 10, 2024 (about three weeks after the trial). The court began by stating that "with the exception of Dr. De Marchis, all of the witnesses were credible in every material respect. The Court expressly finds that Dr. De Marchis was not credible with respect to his opinion that Mr. Anderson did not know the wrongfulness of his actions at the time he killed Mr. Thomas." Tr. at 296. The court made the same finding about Dr. De Marchis in its written decision. *See* Bench Trial Verdict Entry – Guilty on All Counts (June 11, 2024) ("Bench Verdict"), p. 2, fn. 3. During the oral decision, the court rejected the insanity defense, finding that "Dr. De Marchis' opinion, distilled to its essence, is that despite knowing that killing Mr. Thomas was illegal, Mr. Anderson believed he was justified based upon his own moral beliefs and delusions and thus did not know it was wrong. But under Ohio law that governs this Court here, that opinion is flatly wrong." Tr. at 299-300. The court therefore found Anderson guilty of all charges and set sentencing for June 27.

{¶ 32} Before sentencing, the court filed its written decision, making the same findings. In particular, the court relied on a case from the Tenth District Court of Appeals, which had said "**if a defendant knows his or her conduct violates the law and**

**commonly held notions of morality, that defendant cannot avoid criminal responsibility when he or she acts on subjective rules even though delusions led him or her to believe he or she was acting as or like a superior power**." (Emphasis in original.) Bench Verdict at p. 5, quoting *State v. Jennings*, 2006-Ohio-3704, ¶ 22 (10th Dist.).

{¶ 33} According to Anderson, the trial court incorrectly failed to focus on his state of mind at the time of the crime. Anderson further contends the court erred by failing to distinguish between "knowledge of murder" and Anderson's false belief, due to severe mental illness, that his actions were not wrongful in this instance. Appellant's Brief, p. 8.

{¶ 34} As a preliminary point, " '[w]hen expert witnesses differ in their opinions regarding the insanity defense,' the finder of fact 'must make a credibility determination when deciding which experts to believe.' " *Moore*, 2024-Ohio-994, at ¶ 67, quoting *State v. Petrie*, 2016-Ohio-4941, ¶ 5 (9th Dist.). The trial court did so here. "Because an insanity defense ultimately rests on the credibility and persuasiveness of the experts' testimony, appellate courts have consistently declined to second-guess the trier of fact's interpretation of the evidence in NGRI cases given the deferential standard of review." *State v. Sanders*, 2022-Ohio-2261, ¶ 72 (8th Dist.), citing *State v. Cochran*, 2017-Ohio-216, ¶ 56 (2d Dist.). (Other citations omitted.)

{¶ 35} Furthermore, while our district has not previously addressed the specific issue of moral justification, we agree with the approach taken in *Jennings*, as other courts have. There, the court began by observing that "[n]o Ohio case law directly addresses the argument defendant raises: whether a belief, induced through mental illness, that a

defendant's actions he or she knows to be contrary to law may nonetheless be the grounds for a not guilty by reason of insanity defense if the defendant believes his or her actions were morally justified." *Jennings* at ¶ 20. The court rejected this argument, noting that:

The concept of "wrongfulness," including its moral component, generally is defined according to and is reflected in society's laws. As a result, what is morally wrongful in society's view usually will be co-extensive with and embodied in society's laws. Indeed, laws at their very root are a society's collective moral beliefs, developed over time, to prescribe the standards by which citizens interact with each other. An offense against the law, according to the accepted standards of society, is also condemned as an offense against good morals. *See People v. Schmidt* (1915), 216 N.Y. 324, 340. As Judge Cardozo stated, "[o]bedience to the law is itself a moral duty." *Id.* As a result, knowledge that an act is illegal in most cases will justify the inference of knowledge that it is wrong. *Id.* at 333-334. If an individual's subjective moral beliefs of "wrongfulness" conflict with societal standards, the individual may choose either to conform to the laws of society or to suffer the punishment that accrues from ignoring those laws.

*Id.* at ¶ 21.

**{¶ 36}** The Tenth District followed these remarks with the observation the trial court quoted here, i.e., that "if a defendant knows his or her conduct violates the law and commonly held notions of morality, that defendant cannot avoid criminal responsibility

when he or she acts on subjective rules even though delusions led him or her to believe he or she was acting as or like a superior power." (Citation omitted.) *Id.* at ¶ 22.

**{¶ 37}** *Jennings* involved a situation like the present, in that the "defendant suffered from paranoid and grandiose delusions that focused on [the victim] and caused defendant to believe [the victim] was a multiple murderer who would attempt to kill defendant and others if defendant did not act. Defendant felt he was the only one who could stop [the victim], because the government and police were part of a conspiracy against him and would not believe him." *Id.* at ¶ 12.

**{¶ 38}** The defendant in *Jennings* intermittently worked at a bar the victim managed. He also had often visited the home the victim and other bar employees shared. The defendant considered these people to be friends, and there was no evidence of discord or a motive for the killing other than defendant's delusions. *Id.* at ¶ 2-3. After the murder, the defendant compared his actions to Joan of Arc's crusade, and as justification, told his expert that, " 'I felt if I had to kill those two people [referring to [the victim] and his roommate] . . . , who are multiple murderers, [to stop them] from killing again, then more people would be alive. No one else would die by their hands. If that's wrong, then I'm screwed by the people who are in this position of power over me. But because the government says it's not self-defense, therefore it must be wrong. I don't believe it to be true.' " *Id.* at ¶ 13-14.

**{¶ 39}** The defense expert testified that while the defendant knew his actions were legally wrong, he "did not know the 'wrongfulness' of his actions within the meaning of R.C. 2901.01(A)(14) because he was convinced that killing [the victim] was necessary

and right to prevent [him] from killing many others. The expert found that defendant was " 'on a mission to do the right thing' and invoked a vigilante-type of self-defense." *Id.* at ¶15.

{¶ 40} The State's expert disagreed, noting the defendant eluded the police and did not want to get caught; lied during interrogation and said he had not done it; and acknowledged his conduct was wrong. *Id.* at ¶ 16. The defendant stated that he "knew right from wrong, but he didn't think it was wrong. He felt he had to lie so he could tell his story [of self-defense] later." *Id.* at ¶18. Reminiscent of what Anderson said in his email, the defendant in *Jennings* admitted "that the whole plan was not well thought out: 'if it was, I would have gotten away with it.' " *Id.*

{¶ 41} It is true that Anderson did not flee from police. However, each case will have differences, and this is simply one point among many others that Dr. Nichting considered. Again, the trial court's role was to judge the experts' credibility and it did so. The court clearly found that Dr. De Marchis lacked credibility on this issue.

{¶ 42} Other courts have interpreted the second prong of the insanity test as *Jennings* did. *See State v. Carreiro*, 2013-Ohio-1103, ¶ 25 (12th Dist.) (finding that "trial court's jury instruction which instructed the jury that a defendant cannot escape criminal responsibility for what he knows to be legally wrong by assuming a cloak of personal belief that his actions were morally justified was a correct statement of law. . ."); *Moore*, 2024-Ohio-994, at ¶ 59-66 (discussing *Jennings* at length and noting that a psychologist's "attempt to distinguish 'illegal' versus 'wrongful' conduct is not a distinction that Ohio law recognizes as satisfying its NGRI standard"); *Mammone v. Jenkins*, 49 F.4th 1026, 1050

(6th Cir. 2022) (concluding that under Ohio law, "[t]he term 'wrongfulness' applies to legal, not moral, wrongs").

{¶ 43} In *Carreiro*, the court extensively reviewed how the insanity defense had been interpreted before being codified in 1990. The court noted that before the defense was codified, the test in *State v. Staten*, 18 Ohio St.2d 13 (1969), controlled. *Carreiro* at ¶ 19. Courts interpreting *Staten* had found that a defendant was held "to understand the 'wrongfulness' of his actions if he knew his behavior was legally wrong." *Id.*, citing *State v. Jakub*, 1992 WL 14897 (8th Dist. Jan. 30, 1992), and *State v. Luff*, 85 Ohio App.3d 785 (6th Dist.1993). In *Jakub*, the court had acknowledged that " '[a]though the term "wrong" is not qualified in a legal or moral sense [in *Staten*], we construe it to mean legally wrong. If we were to enforce our laws according to each individual's moral standards, our society would be one of anarchy.' " *Id.*, quoting *Jakub* at *2.

{¶ 44} The court noted in *Carreiro* that other appellate districts also had interpreted wrongfulness to only include "legal wrongfulness" and stressed that, when the legislature amended R.C. 2901.01(A)(14) to include the NGRI defense, it did not change the "wrongfulness" language used in *Staten*. *Id.* at ¶ 21. Ultimately, the court found, as indicated, that "wrongfulness" is limited to legal wrongs, rather than a personal belief of moral justification or moral imperative. *Id.* at ¶ 21-25. Again, we agree with *Jennings* and the other courts that have considered this specific issue.

{¶ 45} Furthermore, beyond what has already been said, we note other matters Anderson self-reported to Dr. Nichting. These remarks revealed that Anderson was aware that harming others was wrong and that he previously had refrained from harming the

victim due to his awareness of prior legal consequences that arose when he tried to harm others. During an interview with Nichting, Anderson recounted that:

> [H]e had been homeless and staying at a park. He said that when the victim approached him for the first time, he had "some past life memories" of him and felt as if he was "dangerous," further saying that he "just remembered him" but not about anything specific. . . . For the next two weeks, Mr. Anderson stated that the victim had visited with him at the park "almost daily," with them smoking methamphetamine together a total of four times. He said they would typically converse about "just life I guess" but was unable to recall any specific details of their conversations. However, one day, Mr. Anderson reported that the victim had told him he had given a female methamphetamine and "used it to have sex with her," . . . He reported that it was at this time that he began giving "serious thought" to hurting the victim when he made this comment, also saying that he had thought he "might have to do something." However, he then reported that he decided to "let it go" and "didn't react to it" due to the prior legal case in which he was involved related to his brother. Mr. Anderson elaborated, saying he had been attempting to no longer fixate on individuals who "have done something" in the past because he "had gotten in trouble" and it "didn't end well." He stated that he recognized harming individuals for something they had done in the past was "wrong" but said his mindset was that it "would have been different" when someone spoke about plans to rape

someone in the future, specifically that he may have to engage in behavior to "prevent that" from occurring.

Ex. 71 at p.6. These remarks indicate that Anderson was aware of the wrongfulness of his conduct at the time of the offenses.

{¶ 46} Based on the above discussion, we conclude that the court's decision to reject Anderson's insanity claim was not against the manifest weight of the evidence. The first assignment of error, therefore, is overruled.

## III. Ineffective Assistance of Counsel

{¶ 47} Anderson's second assignment of error states that:

Appellant Was Denied Effective Assistance of Counsel as Guaranteed by Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments.

{¶ 48} Under this assignment of error, Anderson contends trial counsel rendered ineffective assistance by failing to have him testify about his state of mind during the offense. According to Anderson, this forced the judge to rely on witness accounts and conflicting expert reports.

{¶ 49} "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v. Washington*, 466 U.S. 668, 685 (1984), quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942). "A convicted defendant's claim

that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

{¶ 50} In *Strickland*, the court also stressed that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). *Accord State v. Mason*, 82 Ohio St.3d 144, 157-

158 (1998).

{¶ 51} Having reviewed the entire record, we find no evidence that trial counsel acted ineffectively. Contrary to Anderson's claim, the trial court did not just have to rely on witness accounts. The court was also able to view the video of the police interview, which illustrated Anderson's own account of his state of mind during the crime. In addition, the testimony of both experts and their evaluations contained ample evidence of Anderson's remarks about his state of mind at the time of the offense. *See* Tr. at 205, 206, 208-209, 221, 238-239, 241-242, 245-246, 249-251, and 266; Ex. A, p. 1-2, Ex. 71 at p.6-8, and Ex. 59.

{¶ 52} Furthermore, " 'the right to testify is an inherently personal right and is exercised or waived by the client, not the attorney.' " *State v. Bowshier*, 2016-Ohio-8184, ¶ 14 (2d Dist.), quoting *State v. Copeland*, 2002 WL 63161, *2 (2d Dist. Jan. 18, 2002). Thus, while " 'the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed.' " *State v. Matzdorff*, 2015-Ohio-901, ¶ 23 (2d Dist.), quoting *United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000). "This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is 'strongly presumed to have rendered adequate assistance' in carrying out the general duty 'to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.' " *Webber* at 551, quoting *Strickland*, 466 U.S. at 688-690.

{¶ 53} Anderson has not suggested how his testimony at trial would have aided

his defense or added anything to what he had already reported. As stated, Anderson's assent is presumed. Testifying also would have allowed the prosecution to cross-examine Anderson, which could have been harmful.

{¶ 54} Accordingly, trial counsel did not render ineffective assistance. The second assignment of error, therefore, is overruled.

## IV. Merger

{¶ 55} The State's cross-assignment of error states that:

The Trial Court Erred at Sentencing by Merging Count Nine with Count One Because Anderson's Conduct in Attacking Daniel Thomas with a Machete Was Committed Separately from His Conduct in Running Daniel Over with His Car, and Because Each Offense Caused Separate, Identifiable Harm.

{¶ 56} Under this cross-assignment of error, the State argues the trial court erred in merging the felonious assault and murder convictions because these crimes caused separate, identifiable harm and were committed separately. Appellee's Brief, p. 10.

{¶ 57} In its sentencing memorandum, the State agreed that Counts Two through Five would merge into each other, and that this resulting murder conviction would merge into the Count one murder conviction (all five counts relating to the death by use of a machete). The State elected to proceed with sentencing on the Count One murder conviction. In addition, the State agreed that Counts Six through Nine (relating to murder and felonious assault by the motor vehicle) merged into each other. The State elected to

proceed on sentencing as to Count Nine, which was the conviction for felonious assault. State's Sentencing Memorandum (June 24, 2024), p. 2-3.

**{¶ 58}** The State argued that Count Nine did not merge with Count One because it was committed after the machete attack had ended and caused separate, life-threatening injuries. The State, therefore, asked the court to impose a term of 15 years to life for the Count One murder conviction and a separate, consecutive sentence for the Count Nine felonious assault conviction. *Id.* at 4-6.

**{¶ 59}** During the sentencing hearing, the court rejected the State's argument and decided to merge all offenses into Count One, for which it imposed a sentence of 15 years to life. In this regard, the court found that the animus for both the machete attack and running over Thomas with a car was the same, i.e., to kill Thomas. Tr. at 303. The court stated its further reasoning as follows:

> Those attacks with the machete and the car were committed within literal moments or seconds of each other. For this Court to find that this attack, the purpose of which was to kill Mr. Thomas, was somehow interrupted, would be an engage [sic], at least in my opinion, in rank sophistry, and I am disinclined to do that.

*Id.*

**{¶ 60}** "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " *State v. Ruff*, 2015-Ohio-995, ¶ 10. Ohio affords the same constitutional right via Ohio Const., Art. I, § 10. *Id.* Further, R.C. 2941.25 codifies this

protection by stating that:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 61} In *Ruff*, the court held that three separate factors must be considered in deciding if offenses are allied offenses of similar import. These factors are: "the conduct, the animus, and the import." *Ruff* at paragraph one of the syllabus. The court further stated that:

> Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.* at paragraph three of the syllabus.

{¶ 62} "The conduct, the animus, and the import must all be considered." *Id.* at ¶ 31. This is a disjunctive test, meaning that if a court finds any one of the three factors

true, a defendant may be convicted of multiple offenses. *E.g., State v. Smith*, 2018-Ohio-5183, ¶ 29 (11th Dist.) ("the *Ruff* test is stated in the disjunctive."); *State v. Rucker*, 2020-Ohio-2715, ¶ 14 (8th Dist.) (noting that "conduct analysis is but one prong of the disjunctive standard").

{¶ 63} In discussing whether offenses are of dissimilar import, the court also remarked in *Ruff* that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. *Accord State v. Dean*, 2015-Ohio-4347, ¶ 204; *State v. Barron*, 2024-Ohio-5836, ¶ 43 (2d Dist.).

{¶ 64} We apply a de novo standard of review when evaluating R.C. 2941.25 merger decisions. *State v. Williams*, 2012-Ohio-5699, ¶ 28. In such situations, a reviewing court defers to factual decisions but "owes no deference to the trial court's application of the law to those facts." *Id.* at ¶ 26. Here, the trial court failed to consider the issue of whether Anderson's offenses caused separate and identifiable harm. Clearly, they did.

{¶ 65} There was no question that Anderson attacked Thomas with a machete. The physical evidence revealed the attack started in the shelter, because a trail of blood began there, went across the back of a building, around a pillar, and then to Thomas's body, which was in the parking lot next to his truck. Tr. at 130-131. After ending the attack, Anderson then walked to a picnic table in the shelter and put down the machete. He then walked over to his car, got in, drove around the parking lot, and drove over Thomas with the car. Anderson admitted doing this, both in his police interview and in self-reporting

during interviews with the psychologists. He also stated that he had driven over Thomas's torso. Ex. A at p. 4; Ex. 71 at p. 7; and Ex. 59. As previously noted, the coroner discussed the injuries to Thomas and stated, consistent with Anderson's account, that the multiple injuries to the ribs were caused by compression from the car, not the machete. Thomas was also alive when this harm occurred. Tr. at 194-196; State's Exs. 56 and 57.

{¶ 66} In *Barron*, 2024-Ohio-5836, we considered a defendant's claim that the trial court erred in failing to merge his convictions for felonious assault, domestic violence, and abduction. *Id.* at ¶ 39. The convictions arose from a single domestic dispute between the defendant and his wife (the victim). The facts elicited at trial were as follows:

> The victim testified that she and Barron had been married for five years and that in March 2023, they had been living together in a single-family home that was owned by her mother. With regard to the incident in question, the victim testified that on March 2, 2023, she was sleeping on the living room couch when she awoke to Barron lying on her chest. At first, Barron was being nice and was in a good mood, but that suddenly changed when Barron stood up and started yelling at the victim. The victim stood up in response, and Barron grabbed the victim and pushed her against a utility closet door, which broke, causing the victim to fall backward. Thereafter, Barron grabbed the victim and pushed her into a bedroom. While the victim was on the bed, Barron pulled out a kitchen knife with a six-to-eight-inch-long blade and jabbed the knife toward the victim's stomach area two or three times. The victim grabbed the end of the knife to stop Barron from

jabbing it at her, which resulted in a cut on the victim's finger. Barron then stuck the knife into the bedroom wall.

After Barron stuck the knife into the wall, he put one hand on the victim's chest and used his other hand to grab the top of the victim's ponytail. Barron then pulled on the victim's ponytail until the victim's neck popped, which left her with no feeling in the back of her head. The victim, who had been on the bed, then backed up against the wall. While she was against the wall, Barron struck the victim on the head a couple of times with the victim's cellphone. The victim testified that Barron smacked the cellphone against her head so hard that the screen went out of the cellphone.

*Id.* at ¶ 7-8.

**{¶ 67}** We rejected the defendant's allied offenses claim, stating "the record establishes that each of Barron's offenses resulted in separate, identifiable harm to the victim. Barron's felonious assault offense was based on Barron's jabbing a kitchen knife at the victim, which resulted in a laceration to the victim's finger when the victim tried to stop Barron's attack. Barron's domestic violence offense was based on Barron smashing the victim's cellphone against the victim's head, which damaged the victim's cellphone and left a visible red mark on the victim's head near her hairline. Barron's abduction offense was based on Barron choking the victim and placing the victim in a headlock, which restrained the victim's freedom of movement and left the victim incapacitated and unable to breathe for a period of time." *Barron*, 2024-Ohio-5836, at ¶ 44.

**{¶ 68}** The events in *Barron* occurred during a short period of time but caused

separate, identifiable harm. The same situation exists here. While this alone is fatal to Anderson's merger claim, we also conclude that Anderson committed separate offenses. "Offenses are committed separately within the meaning of R.C. 2941.25(B) if 'one offense was complete before the other offense occurred, . . . notwithstanding their proximity in time and that one [offense] was committed in order to commit the other.' " *Id.* at ¶ 46, quoting *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.).

{¶ 69} As an example, in *Barron*, we found that "Barron completed the offense of felonious assault with a deadly weapon when he jabbed the kitchen knife at the victim's stomach area. After that offense was completed, Barron then committed domestic violence by smashing the victim's cellphone against the victim's head." *Id.* at ¶ 47. *See also State v. Boyd*, 2020-Ohio-5181, ¶ 45 (8th Dist.) (noting that during the course of one incident, defendant "made three distinct decisions: first, to stab his wife with a knife; second, to drag her by her neck away from the neighbors' house; and third, to try to hit her with a car in the front yard. [His] separate acts support the conclusion that the two felonious assault and abduction offenses are not allied offenses of similar import.") Accordingly, the trial court erred in merging Anderson's felonious assault conviction with the murder conviction.

{¶ 70} Based on the preceding discussion, the State's cross-assignment of error is sustained. The trial court's judgment will be reversed and remanded for resentencing only with respect to Count Nine (felonious assault). This limited remand is based on the fact that the judgment is being affirmed as to all of Anderson's convictions. The sentence for Count One (murder) is also mandatory. *See* R.C. 2929.02(B)(1); *State v. Wolfe*, 2016-

Ohio-4897, ¶ 13 (2d Dist.), citing *State v. Arendt*, 1980 WL 354799, *4 (8th Dist. Apr. 24, 1980). (Other citations omitted.)

## V. Conclusion

**{¶ 71}** Both of Anderson's assignments of error having been overruled, and the State's cross-assignment of error having been sustained, the judgment of the trial court is affirmed in all respects, except for the court's decision to merge Count Nine (the felonious assault conviction) with Count One (the murder conviction). That part of the court's judgment is reversed, and this cause is remanded solely for resentencing on Count Nine.

. . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.